## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| VETERINARY CARE, INC., *et al.*, | § | Case No. 19-35736 |
| | § | |
| | § | |
| Debtors[1]. | § | (Jointly Administered) |
| | § | |

## DEBTORS' EMERGENCY MOTION FOR
## INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507, AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING USE OF CASH COLLATERAL; (II) AUTHORIZING THE DEBTORS TO OBTAIN SECURED POST-PETITION FINANCING; (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 14 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

---

[1] The debtors in these chapter 11 cases (the "Bankruptcy Case(s)"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Veterinary Care, Inc. (3844) ("VCI") and TVET Management LLC (1790) ("Management," and, collectively with VCI, the "Debtors"). The Debtors' mailing address is 2700 Post Oak Blvd., 21st Floor, Houston, Texas 77056.

**THERE WILL BE A HEARING ON THIS MOTION ON WEDNESDAY, DECEMBER 18, 2019, AT 1:00 P.M. IN COURTROOM 401, 515 RUSK, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**EMERGENCY RELIEF REQUESTED BY DECEMBER 18, 2019.**

Veterinary Care, Inc. and TVET Management LLC, the above-captioned debtors and debtors in possession (the "Debtors"), hereby file this Emergency Motion for Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Use of Cash Collateral; Authorizing the Debtors to Obtain Secured Post-Petition Financing; (III) Granting Liens and Superpriority Claims; (IV) Granting Adequate Protection; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief (the "Motion"), and in support hereof, respectfully state as follows:

## I.   JURISDICTION AND VENUE

1.     This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (M) and (O).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested in this Motion are 11 U.S.C. §§ 105, 361, 362, 364, 364 and 507, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002, 4001-1(b) and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas.

## II.   BACKGROUND

**A.     In General**

3.     On October 10, 2019, an involuntary chapter 11 petition ("Involuntary Petition") was filed against VCI in the United States Bankruptcy Court for the Southern District of Texas,

Houston Division (the "Court").  On November 6, 2019, VCI filed an Answer to Involuntary Petition and Consent to Entry of Order for Relief and Reservation of Rights [ECF # 28] (the "Answer and Consent") and, on November 8, 2019, the Court entered an order for relief (the "Order for Relief") commencing a bankruptcy proceeding under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      On November 18, 2019, Management filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Bankruptcy Cases are being jointly administered.

5.      On November 27, 2019, the Court approved the Debtors' retention of Douglas J. Brickley ("Brickley") as Chief Restructuring Officer ("CRO").  Subject to such appointment and pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are operating their business and managing their property as debtors in possession. No official committee of unsecured creditors has been appointed in the Bankruptcy Cases, and no trustee has been appointed.

**B.     The Debtors' Capital Structure**

      *i.      The Operating Agreements*

6.      Management has entered into various agreements with the Practice Affiliates governing their operation.  Operating and LAVET are operated pursuant to separate agreements titled "Management Services Agreement" and NYOP and ARKOP are operated pursuant to separate agreements titled "Managed Services Agreement."  Each of the Operating Agreements obligates Management to manage the business operations of the Practice Affiliates – requiring Management to account for and deploy operating revenue for the benefit of each of the Practice Affiliates' locations.

7.      Pursuant to the Management Services Agreements regarding Operating and LAVET, Management is obligated to collect and manage practice revenue in accordance with certain contractual Cash Management provisions governing the flow of revenue.  Under each

Management Services Agreement, revenue is required to be collected and managed in three bank accounts: Vet Group Account; Deposit Account; and Management Account.  Management is entitled to receive and collect all revenue generated from the provision of veterinary services and to deposit such revenue into the respective Deposit Account. Each Deposit Account is to be owned by the "Vet Group" (i.e. Operating or LAVET, as the case may be) with Management being designated "attorney-in-fact" for the Vet Group.  Thus, while practice revenue is legally owned by the respective Practice Affiliate, Management is granted contractual control over deposits.  For example, Management has the right to withdraw funds from the Deposit Account and is entitled to the execution of a standing transfer order requiring the periodic transfer of the entire balance of the Deposit Account into a separate bank account owned by Management (the "Management Account"). Management is also permitted to manually transfer funds into the Management Account and to use those funds for any purpose deemed appropriate by Management, subject to the terms of the Management Services Agreement.

8.     Under each Managed Services Agreement, Management is designated as the "Provider" of management services and is granted authority to collect and deposit revenue, make transfers to pay the expenses of each respective Vet Group.  Under each Managed Services Agreement, Management is authorized to collect revenue for deposit into an account owned by each respective Vet Group.  Management is obligated to provide management/administrative services and to maintain practice facilities, including obtaining utility services.   As its compensation for such services Management is entitled to receive a flat fee per month from each Ark Vet and NY Vet (defined as "Costs of Operations").  Significantly, each Managed Services Agreement provides that Management must use Vet Group revenue to pay "Excluded Expenses" (i.e. vet salaries, medical supply expenses, etc.) before paying the Costs of Operation.

4

ii.      *The Pre-Petition Secured Debt*

9.      On April 8, 2016, VitalPet Franchising LLC; TVET Management LLC; TVET Operating PLLC; and VCI (collectively, the "Loan Parties") entered into that certain Loan and Security Agreement with Escalate Capital Partners SBIC III, LP, as lender ("Escalate") for up to $10 million maturing on April 30, 2021 (the "Senior Secured Loan"). The initial advance under the Senior Secured Loan was $3 million with subsequent advances available subject to certain agreed conditions. All advances were secured by an alleged first lien on all or substantially all of the Loan Parties' assets. Other terms of the Senior Secured Loan included: interest at 11.0% per annum in cash, an interest-only period for the first three years, and full amortization of the principal over the remaining two years (no balloon payment) beginning May 1, 2019. Upon an event of default, the parties agreed that default interest would be 15% per annum in cash. The Senior Secured Loan was issued along with a warrant to purchase 193,000 shares of common stock of VCI.

10.     In or around December 30, 2016, VP Senior Capital, LLC ("VP Senior") purchased the Senior Secured Loan and the accompanying warrant from Escalate and advanced additional funds over the next two years bringing the principal balance to $10 million.

11.     On May 1, 2019, and again on June 1, 2019, the Loan Parties defaulted when they were unable to pay the initial two principal payments due under the Senior Secured Loan.

12.     On July 12, 2019, the Loan Parties and VP Senior purportedly entered into an agreement (the "Forbearance Agreement") whereby VP Senior agreed to forbear from the exercise of its rights and remedies on account of such payment failures and other defaults through the earlier of (a) November 8, 2019 or (b) the occurrence of a Forbearance Termination Event, as defined therein.

*iii.*     *Sellers' Notes*

13.     The Debtors' unsecured, non-trade debt primarily consists of twenty-seven (27) promissory notes (collectively, the "Seller Notes") owed to various DVMs arising from the purchase of veterinary hospitals and practices by the Debtors.   The Seller Notes total approximately $9.3 million with a weighted average interest rate of approximately 5.5% and maturities ranging from October 15, 2019 to April 17, 2027.  Approximately $2.9 million of the Seller Notes are convertible into common stock of VCI.

*iv.*     *Equity Interests*

14.     All of the common stock of VCI is owned and held by VitalPet LLC ("Holdco"), a Delaware limited liability company.   Thomas owns 19/30 or approximately 2/3 of Holdco's interests and is the Sole Manager thereof.   The remaining interests in Holdco are held indirectly by Van Pelt.

15.     Additionally, VCI has issued three series of convertible preferred stock: 1,500,000 shares of Series A convertible preferred stock (the "Series A"); 1,253,685 shares of Series B convertible preferred stock (the "Series B"); and 819,000 shares of Series C convertible preferred stock (the "Series C"). The Series A ranks first, the Series B ranks second, and the Series C ranks third.

## C.     Necessity of Debtor in Possession Financing and Use of Cash Collateral

16.     In order to continue operations, the Debtors will require use of Cash Collateral and an injection of new cash as working capital to pay operating expenses and payroll obligations, maintain their real property leases, and ensure their ability to effectively reorganize.  The Debtors do not currently generate sufficient cash from operations to pay their obligations as they come due and address certain operational issues necessary to preserve the value of their businesses, such as addressing the concerns of various DVMs and other employees and maintaining vendor

relationships.  Preserving estate value and maintaining employee and operational relationships is vital in these Bankruptcy Cases.

17.     As has been routinely discussed on the record in these Bankruptcy Cases, the Debtors have an immediate need to use cash right away, or at least within a few days of filing this Motion.  As a result, the VP Senior has agreed to the use of Cash Collateral and to fund the needed cash through a debtor-in-possession loan to the Debtors on emergency basis.  Prior to the entry of the Interim Order (defined below), the Debtors expect to execute the binding commitment with VP Senior to provide post-petition debtor in possession financing pursuant to the terms and conditions set forth in the attached Term Sheet (**Exhibit "A"**) for the purposes and amounts in the attached Approved Budget (**Exhibit "B"**), as more fully set forth herein.

### III.   EMERGENCY RELIEF REQUESTED

18.     Pursuant to Bankruptcy Code sections 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001 and 9014, and Rules 2002, 4001-1(b) and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas, the Debtors request the entry of an interim order substantially in form attached hereto (the "Interim Order"), providing for, among other things:

i.     Authorization for the Debtors to (A) obtain interim financing in the amount of $1,250,000, subject to the terms of the attached Term Sheet and the Interim Order; (B) upon final approval of the Term Sheet and entry of a Final Order, obtain post-petition secured debtor in possession financing in an aggregate principal amount of up to $5,500,000 (the "New Money Loan"); and a roll-up of all amounts owing under all prepetition loans (the "Roll-Up Loan," and collectively with the New Money Loan, the "DIP Loan"), and (C) incur those certain obligations (the "DIP Obligations") owed to the DIP Lender under the terms of the DIP Loan Documents, any Interim Order or order approving the Motion on a final basis (the "Final Order"), and any related agreements, documents and instruments delivered or executed from time to time in connection therewith (collectively, the "DIP Loan Documents");

ii.     Authorization for the Debtors to grant security interests, liens and superpriority claims (including superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d)(1) of the Bankruptcy Code), to the DIP Lender, in the DIP Collateral (as defined in the Interim Order and any subsequent Final Order), including,

without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all DIP Obligations, as more fully set forth in the Interim Order;

        iii.      Authorization for the Debtors to use VP Senior's Cash Collateral and/or Prepetition Collateral pursuant to the Senior Secured Loan Obligation (as defined in the Interim Order), and the approval of the provisions of adequate protection to the Lender for any diminution in value of its interests in the Cash Collateral; and

        iv.      The scheduling of a hearing ("Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in this Motion on a final basis.

## IV.  <u>BASIS FOR RELIEF</u>

### A.    <u>The DIP Loan</u>

19.    Section 364(b) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

11 U.S.C. § 364(b).

20.    If a debtor cannot obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a bankruptcy court can authorize the incurring of debt:

> (1)    with priority over an or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c)(1) – (3).

21.    Additionally, Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization for post-petition financing and specifies, *inter alia*, the content, hearing and notice requires of the motion. *See* FED. R. BANKR. P. 4001(c)(1) - (3).

22.     In seeking the approval of a post-petition loan, bankruptcy courts consider the following factors in determining whether obtaining post-petition financing pursuant to section 364(c) is appropriate: (i) whether the debtor is unable to obtain unsecured credit under section 364(b); (ii) whether the transaction is necessary to preserve the assets of the debtor's estate; and (iii) whether the terms of the transaction are fair, reasonable and adequate under the circumstances. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed post-petition financing) (citations omitted); *In re Farmland Indus., Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

23.     As set forth below, the Debtors submit that the Motion and the DIP Loan satisfy the requirements of the Bankruptcy Code and Bankruptcy Rules and should be approved by the Court.

    i.      *The Debtors Have Been Unable to Obtain an Offer for Unsecured Financing*

24.     The Debtors have been unable to obtain unsecured credit from any third parties allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Lender is unwilling to make any loan to allow the Debtors to move forward with reorganization without a first lien on the Debtors' assets. Given the exigent circumstances of these Bankruptcy Case, the Debtors believe that a first lien would also be required by any other prospective lender, assuming one could be found.

    ii.     *The DIP Loan is Necessary to Preserve Estate Assets*

25.     The Debtors require additional funds to sustain their ongoing operations during the Bankruptcy Cases.  The Debtors submit that entering into the DIP Loan constitutes a sound

exercise of their business judgment because it will allow the Debtors to maintain the current level of operations needed to preserve estate value and progress towards an effective reorganization. Without approval of the DIP Loan, the Debtors will unable to pay their employees or maintain the operational level needed to preserve estate value. Accordingly, the Debtors submit that the DIP Loan should be approved by the Court because it is vital to preserving estate value and is in the best interests of the Debtors, creditors and all parties in interest.

<em>iii.      The Terms of the DIP Loan Are Fair and Reasonable</em>

26.     The terms of the DIP Loan are fair and reasonable in light of the circumstances of these Bankruptcy Cases.  The interest rate was heavily negotiated, and although the DIP Loan provides for first liens on the Debtors' assets, the Debtors are not priming any liens because the prepetition obligations are being rolled-up in to the DIP Loan with the consent of VP Senior.  As set forth above, given that the Debtors cannot generate sufficient unencumbered cash to sustain their operations, the Debtors submit that they could never obtain a loan under equal or better terms if they had to go into the capital markets, and that the DIP Loan is necessary and appropriate.  In light of the foregoing, the Debtors submit that the terms of the DIP Loan should be approved in all respects.

**B.     <u>Use of Cash Collateral</u>**

27.     Pursuant to 11 U.S.C. § 363(c)(2), a debtor may use cash collateral if each entity that has an interest in such cash collateral consents or if the court, after notice and a hearing, authorizes the use of the cash collateral. 11 U.S.C. § 362(c)(2).   Cash collateral is defined as, "[C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest […]."  11 U.S.C. § 363(a).

10

28.     Pursuant to 11 U.S.C. § 363(c)(3), a court must condition a debtor's use of cash collateral as is necessary to provide adequate protection of the interest in the cash collateral claimed by a party.  11 U.S.C. § 363(c)(3).  Additionally, section 363(e) provides that "on request of an entity that has an interest in property … proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

29.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case … but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *Id*. (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  Examples of adequate protection are provided for in section 361 and include, but are not limited to: (i) making a cash payment or periodic cash payments to a secured creditor to the extent that the estate's use of property will result in a decrease in the value of such creditor's interest in the property; (ii) provisions for an additional or replacement lien to the extent that the use of such property will cause a decrease in the value of such entity's interest in the property; and (iii) granting such other relief as will result in the realization by the creditor of the indubitable equivalent of such creditor's interest in the property.  *See In re C.G. Chartier Constr., Inc.*, 126 B.R. 956, 960 (E.D. La. 1991).

30.     As set forth above, in order to finance ongoing prepetition expenses, the Debtors and other Loan Parties entered into that certain Senior Secured Loan and became indebted and liable on a joint and several basis to VP Senior in the aggregate principal amount of not less than $10,0335,000, plus accrued and unpaid fees and interest thereon (the "Senior Secured Loan Obligation").  The Debtors are requesting authority to use the full amount of this Prepetition

Collateral or Cash Collateral for the purposes and amounts set forth in the Approved Budget, subject to the granting of the adequate protection set forth in the Interim Order.

31.     VP Senior, the Debtors' prepetition secured lender, has consented to the (i) financing arrangements contemplated by the DIP Loan Documents and (ii) the Debtor's proposed use of Cash Collateral, on the terms and conditions of the Interim Order.  As a condition to entry into the DIP Loan Documents and the authorization to use Cash Collateral, VP Senior requires, and the Debtors and other DIP Loan Borrowers have agreed, that Cash Collateral and proceeds of the DIP Loan shall be used only in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the Approved Budget.  Without authority to use VP Senior's Cash Collateral, the Debtors will not be able to function as a going concern and will not be able to proceed to consideration of a plan of reorganization because they do not have sufficient access to working capital to operate their businesses in the ordinary course.  Accordingly, authority to use Cash Collateral is necessary to avoid the shutdown of the Debtors' businesses and will be in the best interests of the Debtors, their estates and their creditors.

32.     The Debtors intend to provide adequate protection to VP Senior, to the extent of any diminution in value, for the use of the Cash Collateral by providing VP Senior post-petition replacement liens pursuant to 11 U.S.C. § 361(2) in all post-petition personal property, including cash generated or received by the Debtors subsequent to the Petition Date or Order for Relief, as the case may be, to the extent that VP Senior had valid, perfected prepetition liens and security interests in such similar collateral as of the date of the order for relief.  Such replacement liens shall be subordinate to the liens granted to the DIP Lender pursuant to the Interim and Final Orders.

33.     Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for

authorization to use Cash Collateral, in accordance with and pursuant to the terms and conditions contained in the Interim Order.

34.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, but "only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  FED. R. BANKR. P. 4001(b)(2).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.

35.     For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of their estates.

## V.   REQUEST FOR FINAL HEARING

36.     Pursuant to Bankruptcy Rules 4001(b)(2) and the Complex Case Procedures, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## VI.   WAIVER OF BANKRUPTCY RULE 4001(a)

37.     The Debtors request a waiver of the stay of effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  As set forth herein, the use of Cash Collateral is necessary to allow the Debtors to operate their businesses and meet their working capital needs.  Furthermore, allowing the Debtors' use of Cash Collateral will prevent irreparable harm to the Debtors' estates.  Accordingly, the Debtors submit that ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3).

## VII.  <u>NOTICE</u>

38.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Debtors' Master Service List; (iii) the Internal Revenue Service; and (iv) all parties for which notice has been requested pursuant to Bankruptcy Rule 2002 or is required by Bankruptcy Rule 4001(c)(1)(C).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is necessary.

## VIII.  <u>BASIS FOR EMERGENCY RELIEF</u>

39.     An emergency exists because of the Debtors' need for new cash and continued use of Cash Collateral to sustain their operations and preserve estate value.  The Debtors have a need to use cash right away, or at least within one or two days of filing this Motion.  The Debtors do not currently generate sufficient cash from operations to pay their obligations as they come due or preserve the value of their businesses.  Therefore, the Debtors submit that emergency consideration of the relief requested in this Motion is warranted under the circumstances and request that the Court enter the Interim Order by December 18, 2019.

## IX.  <u>PRAYER</u>

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order submitted herewith authorizing the Debtors to (i) borrow the funds pursuant to the terms of the Term Sheet and use the Cash Collateral necessary for the interim period in accordance with the Approved Budget; (ii) set a Final Hearing as soon as practicable following 14 days after service of this Motion for approval and entry of a Final Order; and (iii) grant the Debtors such other and further relief as this Court may deem just and proper.

Respectfully submitted on the 17th day of December, 2019.

**OKIN ADAMS LLP**

By:      /s/ *Matthew S. Okin*
           Matthew S. Okin
           Texas Bar No. 00784695
           Email: mokin@okinadams.com
           David L. Curry, Jr.
           Texas Bar No. 24065107
           Email: dcurry@okinadams.com
           Ryan A. O'Connor
           Texas Bar No. 24098190
           Email: roconnor@okinadams.com
           1113 Vine St., Suite 240
           Houston, Texas 77002
           Tel: 713.228.4100
           Fax: 888.865.2118

**PROPOSED ATTORNEYS FOR THE DEBTORS**

**CERTIFICATE OF ACCURACY PURSUANT TO LOCAL RULE 9013-1(I)**

In accordance with Bankruptcy Local Rule 9013-1(I), I hereby certify to the accuracy of the matters set forth in the foregoing Motion.

By:      /s/ *Matthew S. Okin*
           Matthew S. Okin